MOORE, Judge.
Barry Bryant appeals from a summary judgment entered by the Lowndes Circuit Court (“the trial court”) in favor of George Hammonds, Jr.
On May 30, 2013, Bryant filed a complaint against Hammonds alleging that he was the owner of several cattle; that, on or about October 2012, Hammonds had kept five of Bryant’s cattle (“the cattle”); and that Hammonds had retagged the cattle and was claiming the cattle as his own. Bryant asserted that he had demanded that Hammonds return the cattle to him but that Hammonds had refused, and, thus, he claimed, Hammonds had converted the cattle to his own use. Bryant requested a judgment in his favor “for [the] return of the cattle and/or for the value of the [cattle], plus an award of exemplary and punitive damages; and ... any other and different relief’ to which he might be entitled.
Hammonds filed an answer on July 2, 2013. On July 11, 2013, Hammonds filed requests for admissions directed to Bryant. On October 29, 2013, Hammonds filed a motion for a summary judgment, which he supported with his affidavit and an “Alabama Uniform IncidenVOffense” report. In his affidavit Hammonds stated:
“1. My name is GEORGE HAM-MONDS, JR., and I am a resident of Lowndes County, Alabama. I operate a large cattle operation in Lowndes County. I have about 370 acres which abuts property allegedly owned by [Bryant].
“2. Each fall my cattle are tagged and vaccinated. In the spring, we work calves and they are sold in August.
“3. In the past year, my cattle operation has not removed any identification tags from any cattle belonging to another located on my property.
“4. I am familiar with the report of the Lowndes County Sheriffs Department dated November 28, 2012 filed by ... Bryant which claimed that five of his cows were allegedly on my property. It is my understanding that the Sheriffs investigator determined that ... Bryant had no proof of ownership of any such cattle.
“5. I run approximately 75-80 cows on the property' which partially abuts [Bryant’s property]. To my knowledge, none of the cattle claimed by [Bryant] in his complaint are on or have been on my property.”
*372 The narrative on the incident report stated:
“[Bryant] states his property joins (2) separate properties. It joins Mr. Ham-monds & a horse riding club.... [Bryant] states the horses, which are stabled at the horse riding club, damaged [Bryant’s] fence, which allowed the ... cattle to get out from [Bryant’s] property.
“[Bryant] stated he has gone to the fence line of Mr. Hammonds’s property & called for his cows & they all have responded by running to him. [Bryant] further stated each one of his cows no longer had his tags in their ears but had Mr. Hammonds’s tags.
“[Bryant] has no proof of ownership of these cattle, other than photographs & them responding to his call.”
Bryant filed a response to the summary-judgment motion, which he supported with his affidavit and the affidavits of Bryant’s wife, Sharon Bryant; Sam Crum, Jr., Sharon’s father; and Preston Mosley, Sr.
In Bryant’s affidavit, he stated, in pertinent part:
“2. On or about October 21, 2012, I discovered that five (5) of my cows were missing. They can be identified in the bill of sale attached hereto. The cows got loose because horses on the adjacent property had damaged my fencing.
“3. After I discovered my cows on ... Hammonds’s property, my wife called [Hammonds] in late November 2012 to discuss with him that our cows were missing. During the course of the telephone call [Hammonds] denied he knew the whereabouts of the cows. This was not the first time my cows had gotten out on [Hammonds’s] property. On a previous occasion my cows got out and were found on [Hammonds’s] property and he charged us $250 for their return.
“4. I made the attached photographs which depict the scene that was photographed. These photographs are my missing cattle on ... Hammonds’s property and they no longer have my tags. The photographs depict cattle that were at [Hammonds’s] fence line and came from nearly a mile on my call. After my cows came to the fence I gave them feed.
“5. These photographs can be compared to the photographs of cattle on my property where it is apparent that the cows are the same animal, but the tags are different. One cow, a brown heifer, in particular can be easily identified by birth marks on her face.
“6. After I discovered the cows on ... Hammonds’s property, I filed a police report with the Lowndes County Sheriffs office.”
In Mosley’s affidavit, he stated:
“I ... have raised and sold a significant number of cattle over the years. I consider myself an expert in the field and have encountered all types of situations. Cows have many different behavior and there are many different breeds and crossbreeds. A cattleman knows his cattle. I could look at my herd and know if they’re all accounted. Cattle have many distinctive colors and markings. The[ir] different face markings stand out if you pay attention. I personally have knowledge of Barry and Sharon Bryant’s cattle. They asked me for help constructing a strong fence after some of them calves got out. I immediately noticed that there were several older calves or replacement heifers in the group. I remember two in particular: One black calf with a white face, that got out, while I supervised the fence construction. And, there was a brown heifer with an odd white spot on *373 her forehead. She looked as though she had grey hair. I was surprised to see the same two heifers in photos given me by the Bryants. After examining several photographs of the brown heifer, in particular, I identified enough identifiable markings in all photographs to determine they were all photographs of the same heifer. Following are nine identifiable birth marks:
“1. Pointed crown (head) hornless.
“2. Distinctive ears that points out.
“3. The same color eyes.
“4. A distinctive white patch of hair on forehead.
“5. A distinctive white line, on the left side of her face, and under the white patch of hair. This identifiable mark is major. It looks like a tear drop.
“6. A distinctive black coloring above and around the right eye. This is similar to a ‘raspberry’ on humans.
“7. Black lines down the right side of her face.
“8. White coloring around ' the mouth.
“9. A protruding navel which signifies she is close to purebred.”
In Sharon’s affidavit, she stated, in pertinent part:
“On or about Feb. 12, 2012, my husband and I transferred about a 100 calves to Burkeville, Alabama. We had previously checked the fence line surrounding the property and the fence line was in adequate shape. We checked our cows on a regular basis and we noticed that there was a discrepancy between the amount that we took there and the amount we counted. We searched for the missing calves. At the same time the president of the horse club informed us that Mr. Hammonds was looking for the owner of some missing calves. I called Mr. Hammonds and he informed me that he had seen some cows on his property that were not his own. When I told him that I would come and pick them up, he told me that he would not round the cows up until late summer and I could pick them up then. Mr. Hammonds called me in June 2012 and informed me that he had my cattle in a catch pen. My father, my son and I traveled to Mr. Hammonds’s property to pick up the missing cattle. Mr. Ham-monds charged me $250.00 for my cattle eating his grass and said, ‘If any more of your cattle get on my property, I will keep them!’ Some more of my cattle did eventually go on Mr. Hammonds’s property on or about November 2012. I saw a picture of 5 of my cows on Mr. Hammonds’s property. I noticed immediately that my tags had been changed. I called Mr. Hammonds after Thanksgiving 2012. I identified myself ... [and] inquired about my missing cows. Mr. Hammonds told me that he had not seen any cows that were not his own. And if they got out the back side of my property, I would probably never see them again.”
In Crum’s affidavit, he stated: “On about June 15, 2012, I accompanied [Sharon] and her son to ... Hammonds’s place, to pickup her cattle. . After we loaded the cattle into the trailer I heard Mr. Ham-monds inform [Sharon] that if any more of her cattle got on his property he would keep them.”
On March 11, 2014, the trial court entered a summary judgment in favor of Hammonds. Bryant timely filed his notice of appeal to this court. This court transferred the appeal to the supreme court for lack of subject-matter jurisdiction; that court subsequently transferred the appeal back to this court, pursuant to § 12-2-7(b), Ala.Code 1975.
On appeal, Bryant argues that the trial court erred by granting Ham- *374 monds’s motion for a summary judgment because, he says, a genuine issue of material fact exists as to whether Hammonds stole Bryant’s cattle.
“This Court’s’ review of a summary judgment is de novo. Williams v. State Farm Mut. Auto. Ins. Co., 886 So.2d 72, 74 (Ala.2003). We apply the same standard of review as the trial court applied. Specifically, we must determine whether the movant has made a prima facie showing that no genuine issue of material fact exists and that the movant is entitled to a judgment as a matter of law. Rule 56(c), Ala. R. Civ. P.; Blue Cross & Blue Shield of Alabama v. Hodurski, 899 So.2d 949, 952-58 (Ala.2004). In making such a determination, we must review the evidence in the light most favorable to the nonmovant. Wilson v. Brown, 496 So.2d 756, 758 (Ala.1986). Once the movant makes a prima facie showing that there is no genuine issue of material fact, the burden then shifts to the nonmovant to produce ‘substantial evidence’ as to the existence of a genuine issue of material fact. Bass v. SouthTrust Bank of Baldwin County, 538 So.2d 794, 797-98 (Ala.1989); Ala.Code 1975, § 12-21-12. ‘[Substantial evidence is evidence of such weight and quality that fair-minded persons in the exercise of impartial judgment can reasonably infer the existence of the fact sought to be proved.’ West v. Founders Life Assur. Co. of Fla., 547 So.2d 870, 871 (Ala.1989).”
Dow v. Alabama Democratic Party, 897 So.2d 1035, 1038-39 (Ala.2004).
“To establish conversion, a plaintiff must show a wrongful taking, an illegal assumption of ownership, an illegal use or misuse of another’s property, or a wrongful detention or interference with another’s property. The plaintiff must establish that the defendant converted specific personal property to the defendant’s own use and beneficial enjoyment. The plaintiff asserting conversion could also show that the defendant destroyed or exercised dominion over property to which, at the time of the destruction or exercise of dominion, the plaintiff had a general or specific title and of which the plaintiff was in actual possession or to which the plaintiff was entitled to immediate possession.”
Huntsville Golf Dev., Inc. v. Ratcliff, Inc., 646 So.2d 1334, 1336 (Ala.1994) (citation omitted).
In the present case, the evidence is disputed regarding whether Hammonds converted the cattle for his own use. Specifically, Hammonds asserted that he had not retagged the cattle, and Bryant asserted that Hammonds had retagged the cattle. Although Hammonds argues that the bill of sale does not reflect Bryant’s name, Bryant clearly testified that he owned the cattle. Bryant and Mosley testified to specific distinguishing markings that made it apparent to them that Hammonds had re-tagged cattle belonging to Bryant. Although Hammonds disputed the facts as presented by Bryant, at the summary-judgment stage we must view the facts “in the light most favorable to the nonmov-ant[, Bryant].” Dow, 897 So.2d at 1038. Considering our standard of review, we conclude that there was a genuine issue of material fact regarding who owned the cattle and whether Hammonds had converted the cattle. Therefore, we reverse the trial court’s judgment and remand this cause for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
THOMPSON, P.J., and PITTMAN, THOMAS, and DONALDSON, JJ., concur.